(No. 17803.—Decree affirmed.)
FRANCES POLLOCK, Admx., *et al.* Appellants, *vs.* JOSEPH
POLLOCK *et al.* Appellees.

*Opinion filed December 21, 1927.*

1. WILLS—*when prior will is not admissible.* In a will contest case the proponents may introduce a prior will executed when the testator's testamentary capacity was not questioned and which conforms substantially to the instrument contested, for the purpose of refuting charges of undue influence or want of testamentary capacity by showing that the testator had a constant and abiding scheme for the distribution of his property, but where the prior will makes a disposition of property different from that of the contested instrument it cannot be introduced by the contestants to show want of testamentary capacity in the execution of the later will, as the testator would have a right to change his mind so long as his testamentary capacity continued.

2. SAME—*inequality of distribution does not invalidate a will.* The fact that there is inequality in the distribution of the property of a testator cannot, of itself, have the effect of invalidating his will, and where the testator assigns a substantial and sufficient reason for such inequality that reason must be accepted as true in the absence of evidence tending to disprove it.

3. SAME—*what undue influence will invalidate a will.* Undue influence which will invalidate a will must be of such character as to deprive the testator of free agency, must be directly connected with the execution of the instrument, operate at the time it is made, producing a perversion of the testator's mind, and must be a species of fraud.

4. SAME—*what does not constitute undue influence.* Influence resulting from love and affection, which does not seek to control the will of the testator, is not undue influence; and advice or persuasion will not vitiate a will freely and understandingly made.

5. SAME—*when notes signed by testator are not admissible as admissions of contestants on question of testamentary capacity— reversal.* Notes signed by the testator and one of his sons, who was one of the contestants of the will but who died pending the suit, and checks of the testator payable to said son, are admissible only to show that the testator transacted business and to compare the several signatures of the testator, and they cannot be admitted as admissions of the surviving contestants on the question of mental capacity of the testator, although the surviving contestants were

children of the deceased contestant, but the error in admitting the notes and checks generally for all purposes will not reverse when contestants are not prejudiced thereby.

6. SAME—*when burden of proof is on contestants.* The burden of proof in a will contest is always on the proponents to prove the valid execution of the will as required by statute, but where they have made a *prima facie* case by the certificate of the oaths of the subscribing witnesses or by the testimony of the witnesses, the contestants are required to prove the allegations of their bill that the testator was mentally incompetent, as the presumption is in favor of sanity.

7. SAME—*what instruction as to presumption of sanity will not reverse.* Where a will is contested on the ground of want of testamentary capacity, an instruction that every one is presumed of sound mind and memory and capable of transacting business and of disposing of his property by will until the contrary is shown, without stating the proposition that the proponents must first make a *prima facie* case showing testamentary capacity, is only a partial statement of the law, as it cannot be assumed that the will was executed in accordance with the requirements of the statute, but the instruction will not be held so misleading as to require reversal where other instructions require the proponents to establish a *prima facie* case of testamentary capacity.

8. SAME—*what instruction as to right to dispose of property by will should not be given.* An instruction that "where there is no legal impediment to a man's disposition of his estate by will, no kinsman, however close, has any right whatever to such person's estate" as against the will, should not be given without explaining the term "legal impediment," where, apart from the issue of testamentary capacity, no attempt is made to show that the testator was unable to make, or was prevented from making, his will; but giving such instruction is not prejudicial error.

9. SAME—*testator's intention will not be defeated by technical construction.* The intention of the testator must control if it is not inconsistent with some positive rule of law, and a technical construction of words and phrases will not be carried to the extent of defeating the obvious general intention of the testator, especially where the will is drawn by a person unacquainted with legal terms or the force of the legal formulas employed by him.

10. EVIDENCE—*cross-examination should be kept within reasonable limits.* While the cross-examination of a witness need not be confined to the precise phase of a subject introduced on direct examination yet it should be kept within fair and reasonable limits, and the extent to which it may be carried is largely within the trial court's discretion.

APPEAL from the City Court of Sterling; the Hon. IRVING L. WEAVER, Judge, presiding.

JOHN M. STAGER, and CARL E. SHELDON, for appellants.

JACOB CANTLIN, R. W. E. MITCHELL, and LAWRENCE L. WINN, for appellees.

Mr. JUSTICE DEYOUNG delivered the opinion of the court:

Montgomery Pollock, a resident of Whiteside county, on October 18, 1916, executed an instrument purporting to be his last will and testament. The instrument was admitted to record by the county court of that county on July 6, 1923, and letters of administration with the will annexed were issued to Jacob Cantlin. Subsequently, a son, Robert Pollock, and his two children, Robert Pollock, Jr., and Dorothy Pollock, filed in the circuit court of Whiteside county their bill of complaint charging the lack of testamentary capacity and the exercise of undue influence to procure the execution of the instrument by the testator's three daughters and praying that the instrument be set aside. During the pendency of the suit Robert Pollock died, and Frances Pollock, as administratrix of his estate, was substituted in his stead. By agreement of the parties a change of venue was taken from the circuit court of Whiteside county to the city court of Sterling. The suit was tried twice. At the conclusion of the contestants' evidence on the second trial the court granted proponents' motion to withdraw the issue of undue influence from the jury's consideration. A verdict was returned finding the instrument to be the last will of Montgomery Pollock. A motion for a new trial was made and denied and a decree was rendered upon the verdict. From that decree the complainants prosecute this appeal.

Montgomery Pollock was born in Scotland but had resided in Whiteside county for many years. He died on

April 29, 1923, at the age of ninety-two years. Lena Pollock, his wife, was named as executrix of his will, but she died prior to his death. He had eight children, six of whom survived him. By his industry and frugality he had acquired 270 acres of land besides certain personal property. About eight months before he executed the instrument in question he sold 240 acres of his land to his son-in-law, James F. Wetzell. He retained the remaining 30 acres. In 1917 he purchased a home in the city of Rock Falls, in Whiteside county, and occupied that home until his death. The value of his estate was about $30,000.

The only section of the instrument which makes disposition of property is the second. That section is as follows:

"*Second*—After the payment of such funeral expenses and just debts, I give, devise and bequeath unto my beloved wife Lena Pollock the sum of Nine Thousand Dollers ($Five hundred dollers ($9500). Third to my son Joseph, two thousand six hundred ninety-four dollers, fourth to my son Montgomery one thousand eight hundred dollers, fifth to my son William two thousand five hundred dollers, sixth to my son Robert five hundred dollers to be left in trust and he to have just the income during his life time after his death to fall to his son Robert, Jr, and his daughter dorthy. Also the S. E. of the S. E. sec. 25 Township 20 range 6 containing about 30 acres more or less, all to be keept in trust, said Robert Pollock to have the income during his life time after his death to go to above named hiers of his, seventh, to my dauther anna Johnson three thousand Five hundred dollers ($3500), to my dauther Mary David three thousand Five hundred doller ($3500) eight to my dauhter Lena Wetzell three thousand five hundred dollers ($3500).

"Codicil. That my sons Joseph, montgomery, William, and Robert, has already in the past Received the amounts or the Deference Between ($3500) and the Several amounts each has received as above Stated, therefore they are not justly intitled to any more From my Estate in the future.

"also that my Executrix hereinafter named to collect the rent or the interest on the purchase price of land when same falls due."

On the trial fifty-two witnesses testified—twenty-one in behalf of the proponents and thirty-one for the contestants. A number of the witnesses had been acquainted with the

testator for many years.   Some met him often, while others saw him occasionally.   His eyesight was impaired, and he suffered from rheumatism for a considerable period, and this affliction confined him to his home more or less closely. John Pollock, a son, who lived with his father and died before the latter's death, had cancer and took laudanum to alleviate the pain.   Some witnesses testified that the testator also used this drug.   While John Pollock lived he transacted much, if not all, of his father's business.   After his death, Wetzell, the son-in-law, took charge and received $100 annually for his services.   Wetzell's original appointment was verbal but later it was made in writing.

Fifteen witnesses either testified that they noticed no mental change in the testator or that they believed him to be of sound mind, narrating facts upon which they based their opinions.   Some of these witnesses testified that the testator transacted matters of business at or about the time the instrument in question was drawn; that he paid taxes, traded at a store and a grain elevator, bought a horse, kept a bank account and signed checks, executed an agreement, lease, mortgage and notes, and sold the major portion of his farm to his son-in-law.   Witnesses also testified that he spoke connectedly on current local questions to persons who visited him in 1915 and 1916.

From the testimony of contestants' witnesses it appeared that the testator failed to recognize persons with whom he was acquainted; that he showed no interest in discussions between persons; that he was forgetful and that he had hallucinations.   One witness testified that the testator imagined certain things which did not exist; that he stated that certain of his children were dead when they were alive; that he thought he saw post-holes where none existed; that he saw children playing in a field when none were present; that he became confused very easily; that he could not realize his presence at a particular place, and that when away from home he would not know when to return.

Other peculiarities shown by the testimony of contestants' witnesses were, that the testator would often change his mind and wander from one subject to another and could not carry on a connected conversation; that he exhibited no grief at the funeral of his son John; that on one occasion he denied that he had sold his farm and on another stated that he could not recollect any such transaction; that he was stupid and childish and that he took laudanum. Assuming these facts, contestants' witnesses believed that the testator was of unsound mind and lacked testamentary capacity. The only expert testimony was that of a physician, who, when interrogated hypothetically, expressed the opinion that a person who used laudanum and exhibited the traits and peculiarities concerning which contestants' witnesses had testified was of unsound mind.

Appellants contend that the court erred in withdrawing the issue of undue influence from the jury's consideration. None of the testator's children or grandchildren was present when he signed the instrument in question, and there is no evidence that any of them exerted any influence upon him, either directly or indirectly, to procure its execution. While it appeared that one or more of the children gave the testator laudanum, it was not done to affect or to defeat his purpose in the distribution of his property. Two of contestants' witnesses admitted that Anna Johnson, a daughter, tried to prevent her father's use of the drug and that on one occasion she expressed sorrow that he had formed the habit. Nor does it appear that the testator followed the directions of his children at any time except once, when his son John handed him a lease and said, "Father, sign this." John was at the time in charge of his father's business affairs and the lease was executed. Later, after John's death, Wetzell, the son-in-law, represented the testator. These facts do not tend to show that either John Pollock or Wetzell influenced the testator to execute the instrument, and the bill makes no such charge against them.

On November 15, 1900, the testator made a will by which he gave all of his property to his wife, Lena, for life, with the remainder of his real estate to his sons William and Robert upon condition that they pay specified sums of money to certain other of his children. He made nominal bequests to his sons Joseph and John and gave the residue of his estate to his sons William and Robert. Appellants contend that this will should have been admitted in evidence because the material departures from it by the instrument in question would have a tendency to sustain the charge of undue influence. It is argued that Robert and William would have received a larger share of the estate under the earlier will and that there is no evidence that the testator's attitude toward them was changed after that will was executed. The paragraph of the instrument in question denoted "Codicil" expressly states the reason for the changes made. Robert and William and the other children named, it is stated, had previously received the difference between $3500 and the sum bequeathed to each of them under the later instrument and that they were not justly entitled to more. There was no evidence that the children named had not received the advances mentioned in the instrument in question. For the purpose of establishing that the testator had a constant and abiding scheme for the distribution of his property and thus to refute the charge of undue influence or the lack of testamentary capacity, the proponents in a will contest may show the contents of a former will which was made when the testator's testamentary capacity was not questioned and which in its disposition of his property conforms substantially to the provisions of the instrument contested. The mere fact, however, that a testator by a prior will had made a disposition of his property different from that made by a later instrument of itself would be of little or no value, for, if mentally competent to make a will, he would have a right to change his mind so long as his testamentary

capacity continued. (*O'Day* v. *Crabb,* 269 Ill. 123; *Black-hurst* v. *James,* 304 id. 586.) Hence testimony regarding the contents of a former will, or the will itself, is not admissible where the terms of such a will are variant from the contested instrument. (*Baddeley* v. *Watkins,* 293 Ill. 394; *O'Day* v. *Crabb, supra; Nieman* v. *Schnitker,* 181 Ill. 400; *Taylor* v. *Pegram,* 151 id. 106.) The court properly excluded the former will from the evidence.

The fact that there is inequality in the distribution of the property of a testator cannot, of itself, have the effect of invalidating his will. (*Graham* v. *Deuterman,* 206 Ill. 378.) Where the testator assigns a substantial and sufficient reason for such inequality that reason must be accepted as true in the absence of evidence tending to disprove it. (*Graham* v. *Deuterman, supra.*) No rule of law requires a parent to distribute his property among his children equally or upon any ratable basis of relative merit. He may, with or without a reason, prefer one and disinherit another, or he may give all of his property to a stranger, and the only inquiry admissible is, Was he, when doing so, of sound mind and free from the undue influence of others? (*Waters* v. *Waters,* 222 Ill. 26.) Undue influence which will invalidate a will must be of such a character as to deprive the testator of free agency. It must be such as to destroy the freedom of the testator's purpose and render the instrument more the will of another than his own. Such influence must be directly connected with the execution of the instrument and operate at the time it is made, producing a perversion of the testator's mind, and it must be a species of fraud. Advice or persuasion will not vitiate a will freely and understandingly made. The influence resulting from love and affection, which does not seek to control the will of the testator, is not undue influence. (*Grosh* v. *Acom,* 325 Ill. 474; *Cunningham* v. *Dorwart,* 317 id. 451; *Waterman* v. *Hall,* 291 id. 304; *Farmer* v. *Davis,* 289 id. 392; *Larabee* v. *Larabee,* 240 id.

576; *Snell* v. *Weldon,* 239 id. 279; *Kimball* v. *Cuddy,* 117 id. 213; *Rutherford* v. *Morris,* 77 id. 397.) In the present case there is a total failure of evidence on the issue of undue influence, and the court was justified in withdrawing that issue from the jury's consideration.

Appellants further contend that the court erroneously admitted in evidence certain notes signed by the testator and his son Robert, as well as certain checks made payable to Robert's order, without limiting their admissibility to two purposes: First, as tending to show that the testator transacted business; and second, to compare the several signatures of the testator. Appellees insist that these instruments were not only admissible for the two purposes conceded by appellants, but also to show that Robert, through whom, it is argued, the other contestants claim by privity of interest, then recognized the capability of his father to do business. Where several legatees or devisees take not a joint interest but separate interests, the admissions of some of them are not competent to show the insanity or want of mental capacity of the testator on a bill in chancery to contest the validity of the will on that ground, and it is error to admit such evidence although limited by the court to the party or parties making the admissions. The effect of such testimony upon the issue involved, the validity or invalidity of the will, could not be limited to the legatee or devisee making the admissions, but if admitted would operate against all who claim under the will. (*McMillan* v. *McDill,* 110 Ill. 47; *Campbell* v. *Campbell,* 138 id. 612; *Cunniff* v. *Cunniff,* 255 id. 407.) The rule, however, is different where the admission is by a sole legatee or devisee or the interest of the legatees or devisees is joint. (*Egbers* v. *Egbers,* 177 Ill. 82; *Smith* v. *Henline,* 174 id. 184.) On a bill to contest the validity of a will the declarations and admissions of a deceased devisee are admissible in evidence against another devisee who has succeeded by will or devise to the interest of the deceased devisee on

the ground of privity in estate. (*Mueller* v. *Rebhan*, 94 Ill. 142.) There was no admission by all the appellants that the testator was capable of signing the instruments offered in evidence. A check for $50, signed by the testator at about the time the instrument in question was executed, bears the endorsement of Robert Pollock and his son Robert, Jr., but the signature of Dorothy Pollock does not appear on any of the instruments which were introduced. Under the will the interests of Robert Pollock and his children were neither joint nor identical, for the latter took directly under the will and did not succeed to their father's interest, which consisted only of the income from a portion of the estate during his life. The notes and checks were admissible only for the two conceded purposes and it was error to admit them generally for all purposes. (1 Alexander's Commentaries on Wills, sec. 370.) The error, however, was not prejudicial to the appellants.

John A. Kadel testified in behalf of the appellees. He was a director of the First National Bank of Rock Falls. Appellants complain that they were not permitted to show, on cross-examination, that one of the attorneys for the appellees was also a director of that bank. The fact, if adduced, would have no relevancy to any issue in the case. On the direct examination Kadel had not been interrogated concerning any business relationship with the attorney, and there was no basis for the question on cross-examination. While the cross-examination of a witness need not be confined to the precise phase of a subject introduced on the direct examination, (5 Jones' Commentaries on Evidence, —2d ed.—p. 4585,) yet it should be kept within fair and reasonable limits, and the extent to which it may be carried is largely within the trial court's discretion. (*People* v. *Strauch*, 247 Ill. 220; *People* v. *Harris*, 263 id. 406.) The objection was properly sustained.

Complaint is made that certain instructions given to the jury at the request of the appellees were erroneous and

prejudicial to the appellants. The first and second instructions, it is said, placed the burden of proof upon the contestants. The first instruction told the jury that when a *prima facie* case, as explained in the instructions, has been made out, then the parties seeking to contest the will on the ground of want of mental capacity take the burden of such claim and must prove it by a preponderance of the evidence; that if the question be left equally balanced by the evidence the verdict should be in favor of the validity of the will, and that the evidence of want of mental capacity must preponderate or the instrument will be taken as valid. In the second instruction it is stated that if the proponents have made a *prima facie* case, as explained in the instructions, then for the contestants to maintain the issue successfully they must establish mental incapacity by a preponderance or greater weight of all the evidence, and unless the jury believe that the contestants have proved the averments of their bill concerning mental incapacity by such a preponderance, the jury should, by their verdict, find the instrument to be the last will and testament of Montgomery Pollock. The burden of proof in a will contest is always on the proponents to prove the valid execution of the will as required by the statute, but where they have made a *prima facie* case by the certificate of the oaths of the subscribing witnesses or by the testimony of the witnesses, the contestants are required to prove the allegations of their bill that the testator was mentally incompetent, since the presumption is in favor of sanity. (*Britt* v. *Darnell,* 315 Ill. 385; *Donovan* v. *St. Joseph's Home,* 295 id. 125; *Grosh* v. *Acom, supra.*) The requirements of a *prima facie* case were defined by given instructions, and the rule was correctly stated in the first and second instructions.

The fourth instruction informed the jury that the law presumed, and it was their duty to presume, that every man who had arrived at the years of discretion was of sound mind and memory and capable of transacting ordi-

nary business and of disposing of his property by will or otherwise until the contrary was shown, and that it was their duty to hold that Montgomery Pollock, at the time he executed the paper offered in evidence, was of sound mind and memory, and so to hold until they believed, from a preponderance or greater weight of all the evidence, that he was otherwise. The instruction, it is said, should have been qualified by the statement that the proponents must first make a *prima facie* case showing testamentary capacity. It is not proper to assume that a will was executed in accordance with the requirements of the statute and practically to take that controverted question of fact from the jury. (*Harris* v. *Etienne,* 315 Ill. 540; *Donovan* v. *St. Joseph's Home, supra.*) Appellants did not admit that a *prima facie* case was made but sought to show the contrary. An instruction should not be given which contains only a partial statement of the law and which is likely to mislead. Other given instructions, however, required the proponents to establish a *prima facie* case showing testamentary capacity, and in view of these instructions the jury could not have been misled by the fourth instruction.

The ninth and twelfth instructions, appellants assert, did not contain all of the requisite elements of testamentary capacity. What elements were lacking, or in what other respects, if any, these instructions were defective or erroneous, is not pointed out, and for that reason the ninth and twelfth instructions need not be reviewed. *Duggan* v. *Ryan,* 211 Ill. 133; *Keyes* v. *Kimmel,* 186 id. 109; *Metropolitan Nat. Bank* v. *Merchants Nat. Bank,* 182 id. 367.

The tenth instruction was as follows:

"No next of kin, no matter how near they may be, can be said to have any equitable right to their kinsman's estate. The law has placed everyone's estate wholly under the control of the owner, subject to such final distribution of it as he may choose to make by his last will and testament. Where there is no legal impediment to a man's dis-

position of his estate by will, no kinsman, however close, has any right whatever to such person's estate which can be asserted against the disposition thereof by will."

Complaint is made that neither the tenth nor any other instruction defined the phrase "legal impediment" and that the jury were left to speculate upon its meaning. No definition of the phrase was given, and apart from the issue of testamentary capacity no attempt was made to show that the testator was unable to make, or was prevented from making, his will. The instruction should not have been given, but it was not prejudically erroneous.

The seventeenth instruction informed the jury that if they believed from the evidence that the paragraph designated as the codicil and written in the body of the instrument purporting to be the last will and testament of Montgomery Pollock, deceased, was written therein prior to the time the instrument was signed by the testator and attested by the witnesses, then it was to be considered by them as a part of the same instrument; if, however, they believed from the evidence that this paragraph was inserted after the execution of the instrument, they were instructed that the paragraph should not be considered by them as a part of the instrument; and that even though they believed from the evidence that the paragraph was inserted subsequently to the execution of the instrument, that fact had no effect whatever upon the validity of the remainder of the instrument, and they were instructed to consider such remainder as though the insertion or alteration had never been made. Appellants contend that there was no evidence upon which to base this instruction. A codicil is an addition to or a qualification of a will and is usually made subsequently to the execution of the will. The paragraph in question lacks the characteristics of a codicil. It appears in the body of the will and purports to be a part of it. It does not change or qualify any provision of the will but merely explains the preceding paragraph. The general rule is that the in-

tention of the testator must control if it is not inconsistent with some positive rule of law. A technical construction of words and phrases will not be carried to the extent of defeating the obvious general intention of the testator; and this rule is particularly applicable where the will is drawn by a person unacquainted with legal terms or the force of the legal formulas employed by him. (*Johnson* v. *Askey,* 190 Ill. 58; *Black* v. *Jones,* 264 id. 548; *Fairview Lodge* v. *Gaddis,* 296 id. 570.) The instrument was in typewriting upon a printed form, and the only circumstance which the contestants urge as a ground for suspicion that the paragraph designated "Codicil" was written later than the rest of the instrument is, that the spaces between the lines of that paragraph are greater than between the lines of the preceding paragraph by which the bequests and devises are made. It is altogether probable that the typist may have believed that close spacing was necessary when he wrote the first paragraph but that he found it unnecessary when he began to write the second. Whatever the reason may have been, an inspection of a photographic copy of the instrument discloses no ground for suspicion that the paragraph in question was not a part of the instrument itself and written before the latter was executed by the testator. The appearance of the instrument, alone, may furnish a satisfactory explanation without extrinsic evidence. (*Hutchison* v. *Kelly,* 276 Ill. 438.) The paragraph did not modify, annul or revoke the will. (*Dowling* v. *Gilliland,* 286 Ill. 530.) The facts and circumstances appearing in evidence justified the giving of the seventeenth instruction.

Finding no reversible error in the record, the decree of the city court is affirmed.          *Decree affirmed.*