MARGARET RAYBORN EISEN SNYDER *et al.*, Plaintiffs-Appellants, *v.*
WILLIAM R. POPLETT *et al.*, Defendants-Appellees.

Fourth District    Nos. 16785, 16786 cons.

Opinion filed July 24, 1981.—Rehearing denied August 21, 1981.

Marvin H. Gesell, of Arnold, Gesell & Schwulst, of Bloomington, for appellants.

William F. Costigan, of Costigan and Wollrab, of Bloomington, for appellees.

Mr. JUSTICE MILLS delivered the opinion of the court:

This will contest raises a question of "clergyman's privilege."

A jury determined that the will executed December 29, 1976, is the valid last will and testament of Ruth B. Reynolds, and plaintiffs now appeal, claiming evidentiary rulings by the trial court deprived them of a fair trial.

The complaint alleges that Ruth B. Reynolds lacked the mental capacity to make a will and that undue influence was exerted by James Yoder, the attorney who prepared the will in question. After certain life estates, the residue of decedent's estate is bequeathed: one-third to Northwestern University; one-third to Purdue University; and one-third to be divided evenly between Mennonite Hospital and Meadows-Mennonite Nursing Home. The complaint claims that attorney Yoder was acting as agent for Mennonite Hospital in preparing this will.

## BACKGROUND

Decedent died March 17, 1977, at the age of 89. When this will was executed on December 29, 1976, she was staying at Mennonite Hospital extended care facility. Attorney James Yoder had served as her lawyer

from about 1967 until her death. Mr. Yoder has also served as an attorney for Mennonite Hospital, and he testified that decedent was aware of this fact. Yoder is presently a member of the hospital's estate planning committee.

Leon Schmucher, the director of development for Mennonite Hospital, and James Yoder both belong to the Mennonite Church of Normal. Schmucher is responsible for seeking contributions, but denied that he ever asked decedent to give any money or property to the hospital.

Hal Rayborn—one of the plaintiffs—testified that decedent was his mother's half-sister. When he visited decedent at her farm on December 9, 1976, her speech was broken and she could not read without a magnifying glass.

Prior to trial, the court allowed a motion *in limine* filed by defendant executor, Peoples Bank of Bloomington, precluding testimony concerning the source of decedent's assets. Rayborn stated, in an offer of proof, that his grandfather, James Bailey, earned a lot of money. When Bailey died, the witness' mother did not receive anything. When his stepgrandmother died, she gave all the assets to her daughter, the decedent. This information was derived from Rayborn's conversations with his grandfather. Finding this testimony irrelevant and based on hearsay, the court denied the offer of proof.

Numerous witnesses testified to the extent that decedent was of sound mind and memory when she executed the subject will. Leon Schmucher talked with decedent about McLean County and Mennonite Hospital history. He testified she was very precise. Wanda Beasley described decedent as "sharp as a tack." Dr. Jerry Ringer testified that decedent made her own decision to have a cataract operation in February 1977. And Dr. Rieber Hovde described decedent as one of the most alert 89-year-old patients he has seen.

Reverend David Meeker was called as a witness by plaintiffs. Reverend Meeker served as pastor of the Christian Church, Disciples of Christ, in Lexington during 1976 and 1977, and became acquainted with decedent when she entered Mennonite Hospital in the fall of 1976. Although decedent was not a member of Reverend Meeker's church, he made pastoral calls on her and they had private visits once a week or once every two weeks. Reverend Meeker further testified that he noticed nothing unusual about decedent's speech, hearing, sight, or writing. However, when plaintiffs' counsel questioned Reverend Meeker about conversations with decedent, answers were refused on the basis of a clergyman's privilege. Reverend Meeker refused to state whether he had any conversation with decedent regarding her will in relationship to the Mennonite Hospital or Meadows-Mennonite Nursing Home.

CLERGYMAN'S PRIVILEGE

Plaintiffs first challenge the trial court's ruling that the clergyman's privilege protects the information plaintiffs attempted to elicit from Reverend Meeker. This privilege is codified in "An Act relating to communications to clergymen and practitioners of religious denominations" (Ill. Rev. Stat. 1979, ch. 51, par. 48.1), which provides:

> "A clergyman, or priest or minister, rabbi or practitioner of any religious denomination accredited by the religious body to which he belongs, shall not be compelled to disclose in any court, or to any administrative board or agency, or to any public officer, a confession or admission made to him in his professional character or as a spiritual advisor in the course of the discipline enjoined by the rules or practices of such religious body or of the religion which he professes, nor be compelled to divulge any information which has been obtained by him in such professional character or as such spiritual advisor."

Illinois authorities defining the scope of this privilege are limited. In *People v. Pecora* (1969), 107 Ill. App. 2d 283, 246 N.E.2d 865, *cert. denied* (1970), 397 U.S. 1028, 25 L. Ed. 2d 538, 90 S. Ct. 1274, a priest testified that the defendant had sought spiritual counseling from him but refused to answer questions relating to the conversations between himself and the defendant. Citing the statute, the appellate court rejected the defendant's claim that the trial court erroneously refused to order the priest to answer. In *People v. Byers* (1973), 11 Ill. App. 3d 277, 296 N.E.2d 621, the defendant claimed error in permitting a minister to testify in violation of the clergyman's privilege. The court found any privilege waived, noting that the privilege was not claimed at trial by either the minister or the defendant. In *People v. Diercks* (1980), 88 Ill. App. 3d 1073, 411 N.E.2d 97, the defendant was charged with burglarizing the First Baptist Church in Sparta. The minister of that church visited defendant at the jail and testified at trial that defendant admitted culpability. On appeal, the court found that when the clergyman does not object to testifying, the burden is on the person asserting the privilege to show the disclosure is enjoined by the rules and practices of the relevant religion. That case also indicates that the presence of a third person waives any privilege not to disclose communications made to clergymen.

■▮▮ It is plaintiffs' position that Reverend Meeker waived this privilege when he voluntarily answered questions concerning observations made by him during his conversations with decedent. We agree with the trial court that no such waiver occurred. A plain reading of the Illinois statutes reveals a design to protect those communications between clergymen and laymen that originate in a confidence that they will not be disclosed. Nothing in the statute precludes a clergyman from relating his observa-

tions. Support for this conclusion is found in *Buuck v. Kruckeberg* (1950), 121 Ind. App. 262, 95 N.E.2d 304. In a suit for partition of jointly owned property, the defendant joint tenant claimed that plaintiff's interest in the property was procured through the exercise of undue influence and that the grantor of plaintiff's interest was of unsound mind. The Indiana statute renders a clergyman's testimony incompetent as to "confessions or admissions" made in the course of discipline enjoined by his church. The *Buuck* court found prejudicial error in excluding the minister's opinion as to the grantor's soundness of mind. This Indiana case was relied upon by the court in *State v. Kurtz* (Mo. 1978), 564 S.W.2d 856, where the court ruled a priest's testimony describing his observations—but not any conversations—was properly allowed. We hold that a clergyman may reveal *observations* made by him without waiving the protections of the statute.

■■ Plaintiffs argue that even if the conversations between Reverend Meeker and decedent are privileged, information as to whether there were any conversations regarding her will is not. Plaintiffs claim the trial court should have ordered Reverend Meeker to state whether there were any such conversations. A similar question was presented in *Wirtanen v. Prudential Insurance Co. of America* (1970), 27 Mich. App. 260, 183 N.W.2d 456. The issue was whether the insured died accidentally or by suicide. The defense called as its witness the family spiritual advisor, a Lutheran minister, who had visited the deceased in the hospital after the shooting in question. The court ordered the minister to answer whether he had asked the decedent what had happened, and the minister stated that he had. The appellate court ruled this question and answer highly improper because it left the jury to speculate on whether the deceased said the gun went off accidentally or that he shot himself intentionally. The court found no relevance to a question, the answer to which is in effect, "Yes, I have relevant knowledge, but I cannot testify to it." In the case before us, Reverend Meeker testified that the conversations he had with decedent were confidential. Had he been required to reveal whether he and decedent had discussed her will, the jury would have been left to speculate as to any relevant information the Reverend could not disclose. We find no error in refusing to order Reverend Meeker to reveal the topic of these confidential communications.

■■ Plaintiffs also request this court to rule that the information sought to be elicited is not privileged because it relates to acts of third persons and not to acts of decedent. We decline to create such an exception to the clergyman's privilege under these facts. This court finds no error in the trial court's ruling that Reverend Meeker's communications with decedent are protected from disclosure by the clergyman's privilege. Ill. Rev. Stat. 1979, ch. 51, par. 48.1

A Caveat: This court does not believe that *all* communications made

to clergymen are necessarily protected from disclosure under the Illinois statute, and we do not so hold. But the reasonable scope of the statute does protect those communications that originate in a confidence that they will not be disclosed. In the case at hand, Reverend Meeker testified that the conversations he had with decedent during his pastoral calls were confidential. The conversations in question fall within the reasonable scope of the clergyman's privilege.

### SOURCE OF ASSETS

The second issue raised by plaintiffs challenges the trial court's allowance of defendants' motion to exclude evidence concerning the source of decedent's assets. Plaintiffs rely on language from *Maher v. Maher* (1930), 338 Ill. 102, 107, 170 N.E. 221, 223, that "[i]n a will contest where want of mental capacity is charged, * * * [u]nder some circumstances it is competent to prove the source and extent of the estate * * *." On the other hand, defendants refer us to two earlier cases which indicate that the source of a decedent's assets is irrelevant to a will contest in which undue influence and lack of testamentary capacity are charged. *Turnbull v. Butterfield* (1922), 304 Ill. 454, 136 N.E. 663; *Gregory v. Richey* (1923), 307 Ill. 219, 138 N.E. 669.

● 5 Plaintiffs attempted to show the source of decedent's assets by offer of proof. In denying the offer, the trial court found the testimony of Hal Rayborn irrelevant and hearsay. That ruling is clearly correct. Rayborn had no personal knowledge of the source of decedent's assets, and his testimony was properly excluded for this reason. (McCormick, Evidence §10 (2d ed. 1972); 81 Am. Jur. 2d *Witnesses* §75 (1976).) This proffered testimony is also irrelevant to any issue in this case. It may be characterized as an attempt to convince the jury that a part of this estate is rightfully plaintiffs'. Such evidence is irrelevant under these facts and the trial court ruled properly in excluding it from the jury. *Gregory*.

### INSTRUCTIONS

The plaintiffs tendered jury instructions in support of their theory that James Yoder was acting as agent for Mennonite Hospital in preparing this will, but the trial court refused these instructions. As already stated, Yoder drafted this will and had served as an attorney for the beneficiary, Mennonite Hospital, in the past. He presently serves on the hospital's estate planning committee and is a member of the Mennonite Church.

■■ Each party is entitled to have the jury instructed on its theory of the case (*Blanchard v. Lewis* (1953), 414 Ill. 515, 112 N.E.2d 167), and we find error in the refusal of these instructions. Nevertheless, the evidence in this case overwhelmingly favors the defendants. There is no evidence that the decedent lacked testamentary capacity when she executed the will in

question. And there is no evidence that attorney Yoder influenced the decedent's testamentary plan. We therefore conclude the error in refusing plaintiffs' instructions is harmless. *City of Alton v. Bergesch* (1972), 3 Ill. App. 3d 726, 279 N.E.2d 139.

### Juror Excused

■■ Plaintiffs also claim error in the trial court's decision to excuse a juror who had planned a vacation. The alternate who replaced the excused juror was objected to by plaintiffs, but not removed because plaintiffs had exhausted their peremptory challenges. The discharge of a juror and the impaneling of an alternate is an act of discretion by the trial judge, and there must be a showing of prejudice in order for a reversal to be required. (*People v. Thomas* (1979), 71 Ill. App. 3d 838, 390 N.E.2d 414.) Here, plaintiffs merely assert that they did not want the alternate juror to serve. Plaintiffs have failed to show any prejudice.

The judgment of the trial court is affirmed.

Affirmed.

GREEN and WEBBER, JJ., concur.